COBB, Judge.
Foutz and Crucet, plaintiffs below, appeal from an adverse summary judgment in respect to their claim for damages against Great Central Insurance Company and Crawford and Company. They sued the defendants for abuse of process and malicious prosecution, and also sued Crawford for fraud.
The uncontroverted facts are that Foutz and Crucet submitted forged invoices in the amount of $2,319.00 to Terry McCamie, an insurance adjuster employed by Crawford, to support a loss claim against Great Central. McCamie did not tell Foutz and Cru-cet to forge the invoices, and they did not tell him they had done so. Based on these forged invoices, Great Central paid the claim.
Foutz and Crucet argue McCamie misrepresented to them that Great Central required invoices for merchandise stolen, else there would be no payment. Even if that were true, there is no admissible[1] evidence that McCamie was told, or knew, that Foutz and Crucet had altered two invoices to reflect the claimed cash purchases. In their brief the appellants assert that when they gave the invoices to McCamie, “they implied to him that the invoices had been altered.” In support of this argument, they rely on the deposition of Carl Foutz. That testimony reads as follows:
Q. And you make that copy in such a way a person can’t see something has been pasted onto the original?
A. Yeah.
Q. What did you do with that copy as to which a person looking at it couldn’t tell that something had been pasted onto the original?
A. We gave it to Mr. McCamie.
Q. Did you tell him that you had changed it?
A. No, sir, not in so many words.
Q. Not in so many words?
A. Well, we told him — there was— something — there was, I can’t go back verbatim and remember what was said.
There were indications made to them that we were giving them the invoices, okay, and even, you know, there were invoices in there to cover everything that was taken, because I think from previous conversation we had when we were questioning him about equipment that we had paid cash for, that he had some idea that there were some things that we had paid cash for and more in—
Q. But you said you didn’t tell him that?
A. No, we didn’t tell him that.
******
Q. You said that you gave it to Mr. McCamie. That must have been some other time than the day on which you used paper and paste and copy machine and created it; is that correct?
A. Yes, correct.
Q. How many days later was that?
A. I think it was the next day they came back in and picked the — up all the invoices.
Q. Who came back in?
A. I think it was just Terry that time.
Q. Tell me everything you recall that was said between yourself and Mr. McCamie on that day.
A. Okay. We gave him the invoices. We had — there was reference made that there were invoices in there for everything because, as I started to say before, on the previous time that he was in there when we were asking him about having to have invoices for everything, without telling him, you know, I think that he had some idea we had some things we paid cash for and that he just said, listen, you just get invoices for everything that was gone, that was taken. So, you know, we — there was a little bit of humor involved when we said here are the invoices for everything.
Q. Did you tell him that one or more of the invoices had been changed by you?
A. No.
*539 When the forgeries were finally discovered, after Great Central had paid the claim, Foutz and Crueet then, for the first time, asserted that the forgeries represented actual losses for cash purchases they made but for which they had no documentation. This explanation was conveyed by their attorney, Williams, to Great Central’s attorney, Fisher, who, finding the explanation unconvincing, went to the state attorney with it. At that point Fisher, as the attorney for Great Central, was fully informed and had all the information, prior to prosecution, that his client, Great Central, had access to. He was fully aware at that point of the explanation given by Foutz and Crueet, and it was his decision to turn the information over to the state attorney. The fact that Fisher knew of the explanations for the forgeries by Foutz and Crueet prior to his decision to turn the matter over to the state attorney is clearly shown by his letter to Attorney Williams dated February 23, 1977, which reads:
We were in fact amenable to hearing whatever explanation your clients might have. In your letter of February 9, you refer to my client’s goal as being reimbursement. Actually, as I understood it, the goal of the meeting which was held at your suggestion was to hear what explanations your client had prior to our proceeding further toward possible criminal actions. There has never been any question but that my client would seek reimbursement if warranted, but that would be through civil actions only. As to criminal prosecution, the decision there lies solely in the hands of the law enforcement agencies and the State’s attorney’s office whether they think there is probable cause that a crime has been committed. We will seek reimbursement in a civil action in any event.
Certainly my clients would be reluctant to turn the matter over for investigation by the Sheriff’s Department if somehow your clients could come forth with a believable explanation as to what appears to be an obvious forgery of invoices and an obvious submission of a fraudulent insurance claim. Since the only expía-nation you could give to us at the time of our meeting was that your clients admitted the forgery of the invoices, but that supposedly the fraudulent invoices were prepared to cover for goods-actually purchased from some unknown suppliers, it is our feeling now that we have no alternative but to let the Sheriff’s Department have the facts and to make whatever investigation they feel is appropriate. (Emphasis added.)
It was two days later, on February 25, 1977, that Fisher first met with Deputy Cavender to show him the altered invoices and obtain his advice as to whether there was cause to prosecute. Cavender also interviewed Foutz and Crueet in regard to the altered invoices. Thereafter, Cavender recommended prosecution. The defendants were arrested and brought before a judicial officer, Judge Conser, for a first appearance hearing. The state’s motion seeking pretrial detention pursuant to Florida Rule of Criminal Procedure 3.131 was heard and, based on “the affidavits and/or exhibits on file” Judge Conser found probable cause and ordered the issuance of a capias for each defendant, with a stipulated amount of bond.
A presumption arises from a magistrate’s finding of probable cause which is conclusive, absent fraud or other corrupt means employed by the person initiating prosecution, to bar a subsequent malicious prosecution action. Gallucci v. Milavic, 100 So.2d 375 (Fla.1958). The fraud or corruption relied upon by appellants here is the assertion that MeCamie and Cornell, as agents of Crawford, represented to Deputy Cavender that Foutz and Crueet did not suffer a loss equal to the claims they made under the forged invoices — a fact which may or may not have been true and, obviously, was known only for certain by Foutz and Crueet. The protestations of innocence by Foutz and Crueet are not negations of probable cause.
The issue of probable cause, where facts are not in dispute, is a question of law. City of Pensacola v. Owens, 369 *540 So.2d 328 (Fla.1979). As a mattér of law, there was probable cause in this case, as determined by a magistrate. Moreover, the defendants herein acted on the advice of their counsel, who was fully informed, constituting a complete defense to this action. The undisputed evidence is that no one told or fraudulently induced Foutz and Crucet to forge the invoices, or even knew they had done so until after payment of the claims. The abuse of process claim was properly rejected by the trial court on authority of Blue v. Weinstein, 381 So.2d 308 (Fla. 3d DCA 1980). The trial court’s summary judgment is
AFFIRMED.
DAUKSCH, J., concurs.
SHARP, J., concurs specially in part, dissents in part with opinion.

. See Smyrna Developers, Inc. v. Bornstein, 177 So.2d 16 (Fla. 2d DCA 1965).